Greg M. Zipes
Trial Attorney
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Room 534
New York, NY 10004-1408
Telephone: (212) 510–0500
By:   Greg M. Zipes, Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re

9th & 10th Street, L.L.C.,

Debtor.

-------------------------------------------------------x

Case No. 23-10423 (DSJ)

(Chapter 11)

## DECLARATION OF VALENTINA VLASOVA IN SUPPORT OF
## THE UNITED STATES TRUSTEE'S MOTION TO CONVERT OR DISMISS THE CASE

TO:   THE HONORABLE DAVID S. JONES,
        UNITED STATES BANKRUPTCY JUDGE:

Pursuant to 28 U.S.C. § 1746, Valentina Vlasova declares as follows:

I am a financial auditor with the Office of the United States Trustee for Region 2 (the

"**United States Trustee**").  I am assigned to this matter by my office and as such, I have

knowledge and information about this Chapter 11 bankruptcy case.  I submit this Declaration in

support of the motion of the United States Trustee for an order converting or dismissing the case

of 9th & 10th Street, L.L.C. (the "**Debtor**").

1.      A copy of the disclosure statement dated July 14, 2023 (Dkt. No. 36) is attached as

Exhibit A.

2.      My review of the docket shows that the Debtor filed for bankruptcy relief on March

21, 2023.  My review of the docket further shows that the Debtor has not filed any monthly

operating reports and now owes monthly operating reports for March (stub period), April, May

and June 2023.

3.      My review of the Debtor's commercial insurance policy shows that the insurance

policy was due to expire on July 16, 2023.  In an email to my Office dated July 10, 2023, the

Debtor's counsel stated that the Debtor's principal was going to pay the insurance, but my Office

has not received proof that the insurance has been renewed.

4.      In an email from my Office to the Debtor's counsel dated July 11, 2023, my Office

sent information indicating that the Debtor did not pay taxes and charges that were due on July 1,

2023:

| Account History Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Period | Charge Type | Original Due Date | Interest Begin/Process Date | Charge | Paid | Balance |
| 2024 | 3 | TAX | 01/01/2024 | | 156,564.88 | | 156,564.88 |
| 2024 | 3 | CHARGES | 01/01/2024 | | 621.27 | | 621.27 |
| 2024 | 1 | TAX | 07/01/2023 | | 156,564.88 | | 156,564.88 |
| 2024 | 1 | CHARGES | 07/01/2023 | | 945.33 | | 945.33 |
| 2023 | 3 | TAX | 01/01/2023 | | 148,864.12 | | 148,864.12 |
| 2023 | 3 | CHARGES | 01/01/2023 | | 141,502.00 | | 141,502.00 |
| 2023 | 1 | TAX | 07/01/2022 | | 151,943.96 | | 151,943.96 |
| 2023 | 1 | CHARGES | 07/01/2022 | | 62.05 | | 62.05 |
| 2022 | 3 | TAX | 01/01/2022 | | 140,175.36 | | 140,175.36 |
| 2022 | 3 | CHARGES | 01/01/2022 | | 5,000.00 | | 5,000.00 |
| 2022 | 1 | TAX | 07/01/2021 | | 138,594.24 | | 138,594.24 |
| 2022 | 1 | CHARGES | 07/01/2021 | | 62.05 | | 62.05 |
| 2021 | 4 | CHARGES | 04/01/2021 | | 5,000.00 | | 5,000.00 |

In an email to my Office dated July 11, 2023, the Debtor stated that "taxes are not being paid at the

present time."

I declare under penalty of perjury that the information contained in this Declaration is true

and correct.

Dated: New York, New York
        July 24, 2023

                                        By:    */s/ Valentina Vlasova*
                                               Valentina Vlasova

# EXHIBIT A

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500
Erica R. Aisner, Esq.
EAisner@kacllp.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:

9TH & 10TH STREET, L.L.C,                                    Chapter 11
                                                             Case No. 23-10423 (dsj)
                                    Debtor.
----------------------------------------------------------------X


## DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S AMENDED CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE


Dated: New York, New York
        July 14, 2023

# I. INTRODUCTION

9th & 10th Street, L.L.C., the above captioned debtor and debtor-in-possession (the "Debtor") submits this Disclosure Statement[1] pursuant to sections 101(d)(2)(B)(vi) and 1125(b) of Title 11, United States Code, 11 U.S.C. §§ et seq. (the "Bankruptcy Code") and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 3017-1 of the Local Bankruptcy Rules for the Southern District of New York, in connection with its Amended Plan of Reorganization dated July 14, 2023 (the "Plan") to all known holders of Claims against or Interests in the Debtor in order to adequately disclose information deemed to be material, important and necessary for the Debtor's creditors to make a reasonably informed judgment about the Plan. A copy of the Plan is attached hereto as **Exhibit "A."** *Your rights may be affected. You should read the Plan and this Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one.*

The Plan provides, among other things, for the implementation of a settlement reached by and between the Debtor and Lender regarding the resolution of Lender's senior mortgage on the Debtor's Property and the Claim relating thereto. An agreement providing for the terms of the settlement are set forth in the annexed Plan Support Agreement (see **Exhibit "E"**). Among other terms, the Plan Support Agreement includes provisions that require confirmation of the Plan, Lender approval of various documents, entry of the order confirming the Plan on or before September 15, 2023, and filing and service of a motion to approve bid procedures ("**Bid Procedures Motion**") on or before 30 days before the first scheduled day of the hearing to confirm the Plan. If the Bid Procedures Motion is not timely filed and served, the exclusive period for the Debtor to file and solicit a chapter 11 plan shall automatically terminate. The Entry of an Order approving this Disclosure Statement shall include approval of the Plan Support Agreement, including such conditional termination of exclusivity.

The Bankruptcy Court has scheduled the hearing to consider final approval of this Disclosure Statement and Confirmation of the Plan for _____ ____, 2023 at    :00 .m. Under section 1126(b) of the Bankruptcy Code, only Classes of Claims that are "impaired" under the Plan, as defined by section 1124 of the Bankruptcy Code, are entitled to vote on the Plan. Generally, a Class is impaired if its legal, contractual or equitable rights are altered or reduced under the Plan. Under the Plan, none of the Classes are impaired so there will be no voting on this Plan.

NO REPRESENTATIONS CONCERNING THE DEBTOR ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS STATEMENT. ANY REPRESENTATIONS WHICH ARE OTHER THAN AS CONTAINED IN THIS STATEMENT SHOULD NOT BE RELIED UPON BY YOU, AND SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR, KIRBY AISNER & CURLEY LLP, 700 POST ROAD, SUITE 237, SCARSDALE, NEW YORK 10583, ATTENTION: ERICA R. AISNER, ESQ.

---

[1] Unless otherwise defined herein, capitalized terms used in this Disclosure Statement shall be defined as set forth in the Plan.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. FOR THE FOREGOING REASON, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY, ALTHOUGH GREAT EFFORTS HAVE BEEN MADE TO BE ACCURATE.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN. WHILE THE DEBTOR BELIEVES THAT THE SUMMARY IS FAIR AND ACCURATE, SUCH SUMMARY IS QUALIFIED TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF THE PLAN. REFERENCE IS HEREBY MADE TO THE PLAN FOR A COMPLETE STATEMENT OF THE TERMS AND PROVISIONS THEREOF. **IF ANY INCONSISTENCIES EXIST BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE PLAN SHALL CONTROL. IN THE EVENT OF AN INCONSISTENCY BETWEEN THE SETTLEMENT AND THE PLAN OR DISCLOSURE STATEMENT, THE SETTLEMENT SHALL CONTROL.**

THE COURT HAS APPROVED THIS DISCLOSURE STATEMENT BY ORDER DATED _____ ____, 2023 AS CONTAINING ADEQUATE INFORMATION UNDER THE PARTICULAR CIRCUMSTANCES OF THIS CASE. APPROVAL OF THE DISCLOSURE STATEMENT, HOWEVER, IS NOT TO BE CONSTRUED AS AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT. CONFIRMATION OF THE PLAN BY THE BANKRUPTCY COURT WILL BE CONSIDERED AT A HEARING TO BE SCHEDULED ON THE PLAN. CREDITORS ARE URGED TO CONSULT WITH EACH OTHER AND THEIR COUNSEL REGARDING THE PLAN.

Accompanying this Disclosure Statement are the following exhibits:
*Exhibit "A"* is a copy of the Plan,
*Exhibit "B"* is a copy of the term sheet for proposed financing,
*Exhibit "C"* is a copy of the financial analysis of the Debtor's projected development of the Property as a dormitory,
*Exhibit "D"* is a liquidation analysis, and
*Exhibit "E"* is a Plan Support Agreement between the Debtor and the Lender

## II. <u>BACKGROUND OF THE CASE</u>

### A.    <u>Description and History of the Debtor</u>

The Debtor owns a 5-story, 152,075 rentable square feet historic property built in the early 1906 and operated as a public elementary school (P.S. 64) from 1907 to 1977.

The Debtor purchased the Property from the City of New York (the "<u>City</u>") at a public auction in 1998, which sale closed on July 21, 1999. The Property was sold with a deed

restriction for a Community Facility Use. At the time of the closing, the Property was in the possession of a month-to-month tenant who previously rented from the City for $874 per month. Although the tenant was not permitted to sublease, it was illegally renting out rooms and collecting approximately $35,000 per month in rent. The Tenant had permitted the Property to become a hotbed of illegal activity, which appeared to go unchecked by local law enforcement. Despite serving a 30-day notice to vacate, the tenant, supported by a local City Council member, Margarita Lopez, refused to vacate and the Debtor ended up in a two-year battle in landlord tenant court before it was able to finally evict the tenant in December of 2001.

Between 1999 and 2005, the Debtor solicited schools, community, and not-for-profit groups as potential tenants. In fact, even though the market price for comparable leased space at the time was $18 +/- per square foot, the Debtor offered the space at $12.50, to comply with the deed restriction and to find the right tenant for the Property and the community at large. Unfortunately, despite much interest in the Property, the Debtor was unable to move forward with a lease because, upon information and belief, interested parties were threatened by a local councilperson (Lopez) that their public funding could be impacted if they moved forward with a lease with the Debtor for the Property.

### *Efforts to Develop the Property*

In late 2005 the Debtor moved forward with development of the Property as a college student dormitory, which is an "as of right" use. When the Property was sold it included approximately 100,000 square feet of valuable additional development rights. Although these rights allowed for a 30-story dorm tower, the Debtor agreed - at the request of the NYC Landmarks Preservation Commission ("LPC") - to save the Old P.S. 64 façade and front half of the building and construct a less imposing 19-story dorm, to which the Debtor agreed. With support of the LPC, the Debtor filed for building permits with New York City Department of Buildings ("DOB").

The DOB issued a number of objections, one of which was appealed by the Debtor to the Board of Standards and Appeals ("BSA"), which is comprised of appointees of the NYC Mayor. The final determination of the BSA was that the application lacked documentation (deed or lease) establishing the proposed use as a dormitory. Notably, on March 3, 2005, during the pendency of the BSA proceeding and two days after the Debtor's letter responding and questioning the DOB's authority to layer new unwritten requirements on building permit applications, the DOB issued a proposed rule which later became 1 RCNY §51-01, also known as the *Dorm Rule* ("Rule 51"). Recent litigation discovery has revealed that Rule 51 was drafted by an attorney hired by Aaron Sosnick, a defendant in the Action (defined below). The Debtor pursued its legal remedies following the loss at the BSA but these efforts were not ultimately successful.

In 2006 the City "landmarked" the Property. Recent litigation discovery has revealed that Sosnick hired George Artz Communications, Inc. to negotiate a deal between Councilwoman Margarita Lopez and then Mayor Michael Bloomberg for the City to landmark the Property.

4

In 2008 the East village was "downzoned." It has since been revealed in litigation discovery that Sosnick paid for the rezoning plan which was ultimately adopted by the Department of City Planning. The plan for the 19-story development was to sell the leasehold to a nonprofit corp. with the (sub) tenants to be NYC colleges and Universities. As per the underwriter George K. Baum and Company the estimated minimum cash flow of $4,000,000 per year was to be split 50% to the sub-tenants (NYC colleges and universities) and 50% to the local City Council's office to be distributed to the local non-profit community. This plan was well known to the opposition. The landmarking of the Property as well as the downzoning had the same result; they prevented the Debtor from adding any additional square footage to the Property despite the 100,000 square feet of development rights the Debtor previously acquired. The Debtor received no compensation for the loss of this significant development right, of which it was stripped, and the local non-profit community lost out on two million dollars per year and dedicated space in the building for community rooms.

Between 2012 and 2013, the Debtor secured a 15-year lease for 2 floors with Cooper Union College and a 15- year lease for 2 floors with Joffrey Ballet Center, Inc. In 2013 full architectural plans for a "state of the art" build out were submitted to the DOB. *Eighteen (18) months later* the City (DOB) issued a building permit. Five (5) weeks later, on September 22, 2014, after the City had a year and a half to review and approve the plans, the City issued a stop-work order. It was later discovered that this was the result of a letter written by Councilperson Mendez asking the DOB to rescind the permit because she didn't approve the leases. Although it took nearly a year, in July, 2015, after the Debtor addressed each and every concern and objection raised by DOB regarding the leases, most of which were simply misunderstandings by the DOB, the DOB re-issued the building permits. Three (3) weeks later a second stop-work order was issued. After much back and forth, both tenants cancelled their leases and elected to move on as it was clear that the path forward would be mired in back-room politics and bureaucratic run arounds with no guaranty that they would ever be able to take occupancy of the space.

Over the next few months, the Debtor worked with DOB to clarify and confirm the requirements, written and unwritten, to Rule 51. During this time the Debtor obtained three (3) Zoning Resolution Determinations (ZRDs) to ensure that further leasing efforts would not be met with objection.

In August of 2016, the Debtor entered into a 10-year lease with Adelphi University for 2 floors that complied with each of the specific provisions previously raised by DOB and addressed by the DOB's ZRDs issued in the preceding months. After reviewing all of the Debtor's proposed plans and permit, the DOB wrote to the Mayor's political aides in City Hall, to advise them that the DOB intended to issue Plaintiff's permit. At the Mayor's request, that permit was put on an indefinite hold, and then – after a total of eight (8) months of "review", City Hall instructed the DOB to deny plaintiff's permit, claiming that their lease was not compliant with Rule 51, and raising objections that flatly misread the Zoning Resolution and were simply fictitious. When efforts to address these objections were unsuccessful, Adelphi reached out to the Mayor's office

5

for assistance; they received no response whatsoever. On October 11, 2017, Adelphi advised Debtor that the DOB's refusal to issue a permit compelled Adelphi to terminate its lease. While the Debtor then pursued an appeal of the DOB's objections, these efforts were dismissed as moot, and not decided on the merits, because Adelphi's terminated lease meant that there was no longer any tenant for the property.

*The day after* Adelphi terminated the lease, on October 12, 2017, former Mayor De Blasio announced publicly that the City was interested in purchasing the Property and that it was a mistake for the City (under a prior administration) to have sold it. Lacking a budget, lacking a specific use for the building, and after many fruitless attempts to find a city agency who would be interested in the property – then, lacking any support from his own staff, DeBlasio's public statement was demonstrably false when it was made. Nevertheless, this public statement clearly evinced the Mayor's determination to deter any would-be tenant, lender or investor from investing or lending to the Debtor or , or taking space in the Property. Tellingly, notwithstanding the Mayor's public statement, the City never made any offer to purchase the Property.

### *State and Federal Court Litigation*

While the Debtor battled its way through the labyrinth of obstacles carefully laid out before it, the Debtor continued to investigate the true source of the opposition and in an effort to find a solution acceptable to all constituencies. This included numerous FOIL requests, engagement of a variety of consultants, lobbyists and attorneys and seemingly unending research into the inner workings of the City, DOB and the individuals, political and otherwise, who appeared determined to destroy the Debtor and its plans for any use of the Property at any cost.

On January 24, 2018, the Debtor, together with other related parties, filed an action in United States District Court against the City, DOB, Mayor De Blasio and others asserting violations of the First Amendment, Equal Protection, Due Process, Conspiracy as well as state law tortious interference claims. Ultimately in September of 2019, the District Court granted the defendants Motion to Dismiss the Federal Claims and declined to exercise supplemental jurisdiction over the state law claims.

In June of 2020, after waiting years for a response to its FOIL request, the Debtor obtained internal documents from the City which revealed that a mere twelve (12) days after submission of the Adelphi lease to DOB, the DOB deputy commissioner advised Mayor de Blasio's office that "we have reviewed the lease for Adelphi at 605 E. 9th Street, and we're ok with it. We will be lifting the Stop Work order and issuing the permit." No permit was ever issued.

On October 19, 2020, the Debtor filed an action in state court captioned *Gregg Singer, Sing Fina Corp. and 9th & 10th Street LLC v. Bill De Blasio, Aaron Sosnick, et.al.,* New York State Supreme Court, New York County, 158766/2020 (the "Action"), asserting the state law tortious interference claims which is currently pending. The Debtor estimates the damages sought in the Action to exceed $82,495,980 in actual damages and $26,801,352 in lost cash flow, both of which

have been calculated through February 28, 2023, and filed in the Action.

In January, 2021, motions to dismiss were filed by a number of defendants in the Action. In April of 2022, the State Court issued its decision denying, in part, the motion to dismiss the complaint in its entirety, while granting dismissal of claims for Tortious Interference with Contractual Relations and Prima Facie Tort without prejudice. Appeals of the April 2022 Decision were filed by the City as well as other defendants with the New York Supreme Court, Appellate Division, First Department.

Thereafter Plaintiffs filed an Amended Complaint which added the City of New York as a defendant and two new state-law claims (the "Amended Complaint"). Despite filing Answers to the Amended Complaint, the Defendants continued to pursue the Appeal of the April 2022 decision. Meanwhile, certain Defendants filed motions to dismiss the Amended Complaint

While discovery is incomplete, the evidence produced by the Defendants (both documentary and testimonial) revealed a pattern of illegal conduct perpetrated by the Defendants. Using this newly discovered evidence, on March 20, 2023, Plaintiffs filed a motion for leave to amend the complaint, together with the proposed Second Amended Complaint (the "Second Amended Complaint") which laid out in painstaking detail two new causes of action: (i) Civil Racketeering, in violation of 18 U.S.C. § 1962(c) and (d), and (ii) Nuisance.

What has followed is a series of antics to avoid responding to or addressing the new claims made in the Second Amended Complaint. Due to these tactics, the Motion for Leave to Amend has still not even been calendared by the State Court. Months of extensions have been requested by the Defendants as well as requests for the staying of discovery. Meanwhile, on April 6, 2023, the Appeal was decided in the appellants favor which further complicated matters given that it addressed a Complaint that had subsequently been amended and the Second Amended Complaint awaited (and still awaits) a decision from the Court on the Motion for Leave. In their latest attempt, Defendants have gone so far as to suggest that the Second Amended Complaint is "not before the Court" since the Motion for Leave has not been decided.

### *The Mortgage Loan*

The Debtor, as borrower, is a party to a Consolidated, Amended and Restated Note dated April 21, 2016, with 350 East 10th Street LLC, as lender ("Lender") in the principal amount of $44,000,000 (the "Note"). The Note consolidated prior secured mortgage debt on the Property in the amount of $27,850,000 which was assigned to Lender, with a new mortgage loan entered into with Lender in the amount of $16,150,000. The Note is secured by a senior mortgage on the Property pursuant to an Agreement of Spreader, Consolidation and Modification of Mortgage dated April 21, 2016, and recorded on June 16, 2016.

The Debtor defaulted under the terms of the Note on or about January 1, 2018. On September 26, 2018, Lender commenced foreclosure proceedings in New York State Supreme

7

Court, New York County. The Debtor had difficulties in finding replacement financing because potential lenders, investors and tenants have all been reluctant to get involved until the project can move forward, by a building permit being issued by the City.

***Other Secured Debt***

In addition to the mortgage loan (discussed above), there are a number of judgment liens on the Property arising out of defaulted unsecured loans taken by the Debtor in the total approximate amount of $7 million with accrued interest totaling $17 million.

In addition, in the fall of 2019 the Debtor borrowed additional funds in the approximate amount of $560,000 with accrued interest of totaling $788,000 from four separate lenders who were each given subordinate liens on the Property. These liens are subordinate to both Lender and the above-referenced judgment creditors.

### B.     <u>Significant Events During the Bankruptcy</u>

#### 1.    <u>Bankruptcy Proceeding</u>

On March 21, 2023 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition pursuant to chapter 11 of the Bankruptcy Code.

On April 4, 2023, the Debtor filed its Schedules and Statement of Financial Affairs.

On May 5, 2023, the Debtor filed a motion to set a deadline for filing of proofs of claim. On May 31, 2023, the Court entered an Order scheduling July 17, 2023 as the claims bar date.

#### 2.    <u>Retention of Professionals.</u>

On March 28, 2023, the Debtor filed an application to retain Kirby Aisner & Curley, LLP ("<u>KAC</u>") as counsel.  On June 1, 2023, the Court entered an Order authorizing the Debtor's retention of KAC as counsel, effective as of March 21, 2023.

On May 30, 2023, the Debtor filed an application to retain Hayes Schanzer LLP ("<u>HS</u>") as special litigation counsel, which application is currently pending before the Court.

#### 3.    <u>Settlement with Lender</u>

The Debtor was able to negotiate a settlement with the Lender which is the basis for the Plan, as more fully discussed below. The Settlement provides an opportunity for the Debtor to refinance or sell the Property at a discounted amount by October 31, 2023, failing which the

Property will be sold at public auction and the Lender will be permitted to credit bid at an agreed amount. This settlement affords the Debtor additional time to pursue its claims against the City and work towards obtaining a building permit which will enable it to obtain the requisite capital/financing needed develop the property once and for all.

### 4.    Commencement of Adversary Proceeding and Removal of State Court Action to Bankruptcy Court

Fearing the expense and delay which would certainly ensue from the procedural morass that was created in the Action, as discussed above, the Debtor removed the Action to the Bankruptcy Court where the litigation can move forward in the most efficient and expedient manner. In addition, in an effort to ensure that the Debtor's valuable claims are properly and fully adjudicated, and perhaps in a "belts and suspenders" effort, the Debtor commenced an adversary proceeding in the Bankruptcy Court which substantially mirrors the Second Amended Complaint with one exception (that a claim for Taking has been added). In this manner, the Debtor has ensured that it is properly positioned to move forward with its claims utilizing whichever path is most efficient and therefore in the best interests of the Debtor, its creditors and the estate as a whole.

## III.  THE PLAN OF REORGANIZATION

THE FOLLOWING IS A BRIEF SUMMARY OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE FULL TEXT OF THE PLAN, A COPY OF WHICH IS ANNEXED HERETO AS **EXHIBIT "A."** THIS SUMMARY SHOULD NOT BE RELIED ON FOR VOTING PURPOSES.  CREDITORS ARE URGED TO CONSULT WITH THEIR COUNSEL AND WITH EACH OTHER IN ORDER TO FULLY UNDERSTAND THE PLAN AND EXHIBITS ATTACHED TO IT.  THE PLAN IS COMPLEX INASMUCH AS IT REPRESENTS A PROPOSED LEGALLY BINDING AGREEMENT BY THE DEBTOR, AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.

### A.    General

A Chapter 11 plan of reorganization must (i) divide Claims and Interests into separate categories and classes, (ii) specify the treatment that each category and class is to receive under such plan, and (iii) contain other provisions necessary to implement the reorganization of a debtor. A Chapter 11 plan may specify that the legal, equitable, and contractual rights of the holders of Claims or Interests in certain classes are to remain unchanged by the reorganization effected by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to vote to accept the plan. Accordingly, it is not necessary to solicit votes from holder of Claims in such "unimpaired" classes. In the case of classes in which the legal, equitable and contractual rights of the holders of Claims or Interests have been altered, they are referred to as

"impaired" and are entitled to vote to accept or reject the Plan.

**B.      Classification and Treatment of Claims and Interests**

The Plan segregates the various Claims against, and Interests in the Debtor into unclassified categories and classified claims as follows:

### 1. Unclassified Categories of Claims – Administrative Expense Claims

Administrative Expense Claims include costs by the Debtor after the Petition Date, other than the fees and expense of Professionals retained by the Debtor.

(a)      <u>Category 1 –Administrative Expense Claims (Other than Professional Fee Claims)</u>

Administrative Expenses are costs or expenses of administration in connection with the Chapter 11 Case, including, without limitation, any actual, necessary costs and expenses of preserving the Debtor's estate and the Property, and all fees and charges assessed against the Debtor's estate pursuant to 28 U.S.C. section 1930. The Debtor expects that any such Claims would be de minimus because, other than ongoing real estate taxes, the expenses of the Property have been paid on an ongoing basis.

Any person or entity asserting an Administrative Expense Claim must file a request for payment of such Administrative Expense Claim on or before 5:00 p.m. prevailing Eastern Time on the date that is 30 days after entry of the Confirmation Order.  No payment or Distributions will be made on account of any Administrative Expense Claim until such Claim becomes an Allowed Claim. Any person asserting an Administrative Expense Claim that fails to file and serve an Administrative Expense Claim on or before the deadline to do so, shall be forever barred from asserting any such right to payment as against the Debtor, its estate, or the Reorganized Debtor.

(b)      <u>Category 2 – Administrative Professional Fees</u>

The Debtor has two (2) Professionals whose employment have been approved by the Bankruptcy Court: (1) Kirby Aisner & Curley LLP, its bankruptcy counsel and (2) Hayes Schanzer, LLP, its special litigation counsel. The Court must approve all professional compensation and expenses. Each Professional Person requesting compensation in the Chapter 11 case is required to file an application for allowance of final compensation and reimbursement of expenses so as to be heard by the Court no later than Confirmation of this Plan.

The Allowed Professional Fee Claim of Kirby Aisner & Curley LLP shall be paid by, or on behalf of, the Debtor in full on the later of (i) the Closing Date, or (ii) upon the Order Allowing such Professional Claim becoming a Final Order. The Debtor anticipates that the final (net) fee of Kirby Aisner & Curley LLP to be approximately $75,000.

Upon allowance by the Bankruptcy Court, the Allowed Professional Fee Claim of Hayes

Schanzer LLP shall be paid from third party funds and from the recovery in the Action, in accordance with the agreement between the parties as approved by the Bankruptcy Court.

(c)     Category 3 – United States Trustee's Fees

The Debtor or the Debtor's estate shall pay outstanding United States Trustee statutory fees in full, in Cash, on the Closing Date, to the extent that there is any outstanding balance due at such time.  The Debtor or Debtor's estate shall be responsible for payment of United States Trustee quarterly fees through the entry of a final decree closing the Chapter 11 case.

(d)     Category 4 –Priority Tax Claims

Priority tax claims are unsecured income, employment, sales, and other taxes described by §507(a)(8) of the Bankruptcy Code. Allowed Priority Tax Claims shall be paid in full, in Cash, on the Effective Date. The Debtor does not expect to have any Priority Tax Claims. However, to the extent that any are filed and Allowed, they shall be paid in full on the Closing Date.

**2. Classified Categories of Claims**

(a)     Class 1 – Secured Real Estate Tax Claims

Class 1 shall consist of New York City's secured real estate tax claims and unpaid water charges, which are secured by a superior lien on the Property, shall be paid in full plus interest at the applicable statutory rate on the Closing Date by the Debtor or Debtor's estate. The Class 1 Claim is estimated in the amount of $1,165,374.

The City of New York as the holder of the sole Class 1 Claim is unimpaired and is deemed to accept the Plan.

(b)     Class 2 – Allowed Secured Claim of Lender

The Allowed Secured Claim of Lender shall be treated as follows:

i.     *Discounted Payoff:* The Debtor may payoff the Allowed Class 2 Claim, in the reduced amount of $75,000,000, provided such payoff is received by Lender on or before October 31, 2023.

ii.     *Alternative Sale Process:* If Lender does not receive the Discounted Payoff on or before the Payoff Deadline, the Alternative Sale Process shall be triggered which contemplates the marketing and sale of the Property at public auction.

iii.     *Credit Bid:* Lender shall be permitted to assert a credit bid at the auction in an amount up to the Lender Total Claim.

      iv.    *Plan Funding Following Auction:* If Lender is the winning bidder at auction, at the closing of the sale of the Property to the Lender (or its designee, assignee or nominee), Lender shall fund only the following: (i) the Allowed Class 1 Claim, (ii) all Allowed Priority and Administrative Expenses (except Professional Fees and expenses of Kirby Aisner & Curley LLP in bringing and litigating adversary proceedings, which shall be funded by proceeds of such litigation, and the Allowed Professional Fee Claim of Hayes Schanzer LLP), (iii) any outstanding U.S. Trustee fees; and (iv) a distribution to the Allowed Class 3 and 4 Claims in the amount of $250,000 *pro rata,* which shall not include any deficiency Claim that may be due to Lender.

      v.    *Release of Guarantors and Liens on Other Assets:* The Lender has agreed to release its lien on any Causes of Action, including but not limited to the Action, as well as any potential deficiency claim against any third-party guarantor, provided that the third party guarantor, the Debtor or their respective representatives do not interfere with the confirmation or consummation of the Plan.

      vi.    *Release of Lender:* In exchange for the Lender's support of the Plan and its treatment thereunder, upon the Effective Date, the Debtor, on its own behalf and on behalf of its estate, together with its affiliates, members, officers and directors, shall release any Claim it may have against the Lender or any of its affiliates which accrued prior to the Petition Date which arises out of or relates to the Lender's Allowed Class 2 Claim

The holder of the Allowed Class 2 is Impaired and as such, is entitled to vote to accept or reject the Plan.

  (c) Class 3 – Allowed Claims of Undersecured Lienholders

Class 3 consists of Allowed Claims held by Creditors who may assert a Secured Claim against the Property, by virtue of either the consensual granting of subordinate mortgage lien on the Property by the Debtor or by obtaining a judgment lien arising out of a previously unsecured obligation. However, as a result of the magnitude of the Lender's Claim, such Allowed Class 3 Claims are likely unsecured because the value of the Property is not likely to exceed the amount of the Total Lender Claim. The original principal loaned was in the amount of approximately $6.8 million. As a result of the passage of time and the accrual of interest, the Debtor estimates that the Class 3 Claims total approximately $17 million dollars.

Holders of Allowed Class 3 Claims shall be paid up to 100% of their Allowed Claims,

without interest, as follows:

    a.   If an Alternative Sale Process is <u>not</u> triggered, the holder may select one of the following options:

        i.   *Option 1:* On the Closing of a Funding Transaction, such holder shall receive payment in the amount of 10% of the outstanding principal (original loan amount) due in connection with their Allowed Class 3 Claim; or

        ii.   *Option 2:* 100% of the outstanding principal due in connection with their Allowed Class 3 Claim, payable as follows: (x) 50% payable in ten (10) equal annual installments beginning six (6) months after the issuance of a Certificate of Occupancy by the City and (y) 50% payable in five (5) equal annual installments payable in years eleven (11) through fifteen (15) after issuance of the Certificate of Occupancy;

or

    b.   In the event that an Alternative Sale Process is triggered, and the Property is sold for an amount in excess of the Lender's Total Claim, or such lower amount which it agrees to accept, the holders of Allowed Class 3 Claims shall be paid up to 100% of their Allowed Claims, in accordance with their respective lien priority. In the event that the Property is sold to the Lender pursuant to its credit bid, the holders of Allowed Class 3 and 4 Claims shall by paid $250,000, *pro rata*, which shall be funded by Lender;

and,

    c.   *Pro Rata* payment, together with Class 4, from Net Recovery, if any, after the payment in full of all unclassified Claims.

The Allowed Class 3 Claims are Impaired and as such, are entitled to vote to accept or reject the Plan.

    (d) <u>Class 4 – General Unsecured Claims</u>

Class 4 shall consist of Allowed General Unsecured Claims which shall be paid up to 100% of their Allowed amounts, without interest. The Debtor estimates that the Class 4 Claims total approximately $3.2 million in the aggregate. Class 4 includes, but is not limited to, any Claims of service providers, unsecured lenders, vendors.

Holders of Allowed Class 4 Claims shall receive, up to 100% of the Allowed Claims, without interest, as follows:

a. If an Alternative Sale Process is <u>not</u> triggered, the holder may select one of the following options:

    i. *Option 1:* On the Closing of a Funding Transaction, such holder shall receive payment in the amount of 5% of their Allowed Class 4 Claim; or

    ii. *Option 2:* 100% of their Allowed Class 4 Claim, without interest, payable in ten (10) equal annual installments beginning six (6) months after the issuance of a Certificate of Occupancy by the City;

or

b. In the event that an Alternative Sale Process is triggered, and the Property is sold in excess of the Lender's Total Claim, or such lower amount which it agrees to accept, the holders of Allowed Class 4 Claims shall collectively share, *pro rata*, up to 100% of their Allowed Claim, after the payment of all unclassified Claims and Allowed Class 1, 2 and 3 Claims. In the event that the Property is sold to the Lender pursuant to its credit bid, the holders of Allowed Class 3 or 4 Claims, other than any Claim which arises as a result of any deficiency due to Lender, shall be paid $250,000, *pro rata,* which shall be funded by Lender;

and,

c. *Pro Rata* payment, together with Class 3, from Net Recovery, if any, after the payment in full of all unclassified Claims.

Holders of Allowed Class 4 Claims are Impaired under this Plan and as such, are entitled to vote to accept or reject the Plan.

(e) <u>Class 5 – Interests</u>

Class 5 shall consist of the Debtor's Interest Holders who shall retain their interest and receive any surplus generated from a sale of the Property or Net Proceeds, after the payment in full of all senior unclassified and classified Allowed Claims.

The Class 5 Interest Holders are not Impaired under this Plan and as such, are not entitled to vote to accept or reject the Plan.

14

**3.    Funding and Means for Implementation of the Plan**

**1.    Plan Funding**

Payments under the Plan due on the Closing Date shall be paid from either, (i) a Funding Transaction, or (2) in the event of an Alternative Sale Process, from the proceeds of sale. Subsequent additional funding may come from Net Recovery which shall be distributed in accordance with Article II of the Plan.

Only if a timely Discounted Payoff occurs, title to the Property shall be revested in the Reorganized Debtor, or such third party as the Funding Transaction dictates, upon the Effective Date free and clear of all liens, claims and encumbrances, subject to the obligations of the Reorganized Debtor set forth herein. Otherwise, the Property shall remain subject to the senior mortgage lien of Lender pending the Closing Date.

In the event of an Alternative Sale Process, and no higher or better bid is received from a bona-fide third-party than that of Lender, the Plan shall automatically toggle, and the Property shall be sold to the Lender and, at the closing of the sale of the Property to the Lender (or its designee, assignee or nominee), Lender shall fund only the following: (i) the Allowed Class 1 Claim, (ii) all Allowed Priority and Administrative Expenses (except Professional Fees and expenses of Kirby Aisner & Curley LLP in bringing and litigating adversary proceedings, which shall be funded by proceeds of such litigation, and the Allowed Professional Fee Claim of Hayes Schanzer LLP), (iii) any outstanding U.S. Trustee fees; and (iv) a distribution to the Allowed Class 3 and 4 Claims in the amount of $250,000 *pro rata,* which shall not include any deficiency Claim that may be due to Lender. In the event of an acceptable third-party bid obtained during the Alternate Sale Process, the Plan shall then be funded from the ensuing sale proceeds with the Class 2 Claim of Lender to be paid up to the Lender's Total Claim, or such lesser amount as it may agree in writing. Regardless of the disposition of the Property under this Plan, the Debtor shall retain and prosecute all estate Causes of Action on behalf of the Debtor's estate.

**2.    Funding Transaction; Development Possibilities**

As set forth in Article II, the Debtor shall have until the Payoff Deadline to satisfy the Allowed Class 2 Claim in the amount of the Discounted Payoff. The Debtor has sourced financing for Funding Transaction and by extension, the Discounted Payoff, which funding also includes financing for the development of the Property. However, the Debtor requires the issuance of a building permit from the City in order to close on the financing. A copy of the term sheet for the proposed financing is annexed hereto as Exhibit "B".

(a)    Dorm Development. The Debtor's primary focus since acquiring the Property has been to develop it as a dormitory, which is an "as of right" use based upon the existing deed restriction which has been in place since acquisition. As discussed at length in Section II, "*Background of the Case,*" the Debtor sourced

15

several ideal tenants for the Property but because of the efforts by certain bad actors, these opportunities were thwarted at every turn. The Debtor maintains that this use is the sustainable[2] highest and best use for the Property, under its current zoning and remains committed to pursuing this use which may include utilization by a college or university, preparatory school, not -for – profit organization with sleeping accommodations. which benefits all stakeholders. Annexed hereto as **Exhibit "C"** are detailed financials which provide the projected costs of development and the operating projections once construction is complete, together which support the Debtor's proposed treatment of holders of Allowed Class 3 and 4 creditors, should such creditors elect to remain invested in the Debtor and its future.

(b)  Sanctuary Housing. While New York City has long been known as a "sanctuary city" which provides a safe refuge for undocumented immigrants from deportation or prosecution, this designation has taken on new meaning in recent months. With the migrant crisis getting worse and the number of people and families arriving in New York City daily only seeming to multiply, it is well known that the City is seeking solutions from every corner. To address the need, the Debtor has reached out to multiple representatives from the City offering the Property for just this purpose. The Debtor estimates that with a building permit, the Property could be ready to house 985 single adult migrants within three to four months as "shelter housing" or  535 single adult migrants within eighteen months as a dormitory. The cost of construction associated with a Shelter use is approximately $20 million whereas the cost for a dormitory use is comparable to the costs outlined above and as set forth in Exhibit "B". The rent being offered by the City starts at approximately $80 per bed/ per night. The leases being entered into are typically "triple net" meaning that the tenant (the City) would pay all operating expenses for the Property. Utilizing these figures, if the Property is operated as a Shelter, it would generate approximately $28.7 million annually. Despite having submitted proposals to the City and made a number of inquiries with respect to same, the Debtor, to date, has received no response.

(c)  Residential Development; Removal of Deed Restriction. The third option for the Debtor's development of the Property is to remove the current deed restriction and convert the Property to residential condominium units. NYC Local Law 176 provides a procedure by which a property owner can seek the removal or the modification of a deed restriction. The Department of Citywide Administrative Services ("DCAS") is tasked with the review of such a request, which includes a public hearing, in order to determine if the modification furthers the best interests of the City. The request is ruled upon by a committee of representatives from certain

---

[2] The Debtor estimates that on an annual revenue basis, development as Sanctuary Housing is more lucrative. However, upon information and belief, the City is only considering short-term leases for Sanctuary Housing. As such, the Debtor believes that a use that has more long-term revenue potential is in the best interests of the estate and its creditors.

City agencies and the Mayor's Office, including the Mayor. The Debtor submitted its request to remove the deed restriction on or about March 24, 2022 and the Debtor is current awaiting a response from the DCAS.

If the Debtor is able to successfully remove the deed restriction, the Debtor estimates the cost of construction at approximately $80 million ($51 million in hard costs and $29 million in soft costs) with an estimated sell out at approximately $200 million. At these numbers, the estimated net profit after the payoff of debt and costs in the approximate amount of $35 million.

Additional funding for the Plan may come from the Net Recovery from Causes of Action. However, this recovery is not guaranteed as it requires successful litigation as well as collection of amounts due. On the Effective Date, the Property shall revest in the Reorganized Debtor (or such third party as the Funding Transaction may dictate), free and clear of all liens, claims and encumbrances, subject to the obligations of the Reorganized Debtor as set forth in the Plan and the Settlement. It is important to note that as of the date of this Disclosure Statement, the Debtor has not satisfied the condition of financing, which is the issuance of a building permit for the Property.

### 3. Alternative Sale Process

In the event that the Debtor does not fully and timely remit the Discounted Payoff by the Payoff Deadline, the Plan shall toggle to an auction process. Unless the Debtor shall have previously consummated the Funding Transaction, on or before September 1, 2023, the real estate broker, to be engaged by the Debtor and to be approved by the Lender, (subject to Bankruptcy Court approval) will market and sell the Property on behalf of the Debtor's estate for the highest and best price. The hearing on the Debtor's motion to retain the real estate broker shall be scheduled for on or before the Confirmation Hearing. The Broker shall be permitted to commence marketing the Property on September 15, 2023, with an auction sale to occur no earlier than November 1, 2023 nor later than November 9, 2023, and a closing to occur no later than thirty (30) days thereafter. The foregoing deadlines may be extended only with the express written consent of Lender.

The Debtor shall pursue the sale of the Property in accordance with conventional bidding procedures to be approved by the Bankruptcy Court and the Lender no later than the Confirmation Hearing. In the event of an auction, Lender shall have the right to credit bid up to the full amount of the Lender's Total Claim. The sale of the Property pursuant to the Alternative Sale Process shall be free and clear of all liens, Claims, interests and encumbrances pursuant to sections 363(f), 1123(a)(5)(D) and 1141(c) of the Bankruptcy Code including, among other things, all violations, whether reduced to judgment or otherwise. The winning bidder of the Property shall be entitled to the protections afforded a buyer pursuant to section 363(n) of the Bankruptcy Code.

In the event of an acceptable third-party bid obtained during the Alternate Sale Process, the Plan shall then be funded from the ensuing sale proceeds. In the event that no higher or better

bid is received from a bona-fide third-party than that of Lender, Lender shall fund the payment of unclassified Claims, Allowed Class 1 Claim and an additional $250,000 to be distributed *pro rata* among the Allowed Class 3 and 4 Claims.

## A.     Additional Plan Provisions

### 1.   Resolution of Disputed Claims & Reserves

(a)         Objections.  The Debtor or a party in interest shall file all objections to the allowance of any Claims with the Bankruptcy Court, in writing, no later than ninety (90) days after the Effective Date, with the exception of the Claims of Signature which have been resolved pursuant to the terms of the Settlement.

(b)         Disputed Claims Reserve.  Except to the extent the Court determines that a lesser amount is adequate, the Reorganized Debtor shall deposit in Cash equal to the distribution hereunder that would have been made to holders of Disputed Claims, on such date and in such amount, that the holder would have received its distribution hereunder if such Claims were Allowed Claims, unless otherwise agreed by the holder or by Order of the Court. Upon request of the Debtor, estimation of any Disputed Claim may be adjudicated by the Court pursuant to section 502(c) of the Bankruptcy Code for purposes of determining the appropriate reserve amount.

### 2.   Exculpation

The Plan provides for an exculpation or release for the Debtor and Signature, together with their members, estate fiduciaries, officers, directors, employees, advisors, agents, representatives and assigns, from certain liability for actions taken or omitted in connection with the Plan and its Confirmation. These releases and protections do not extend to acts of bad faith, willful misconduct, gross negligence, breach of fiduciary duty, malpractice, fraud, criminal conduct, unauthorized use of confidential information that causes damages and/ or ultra vires acts.

The Plan also provides for an exculpation or release by all parties in interest of Lender (their members, estate fiduciaries, officers, directors, employees, advisors, agents, representatives and assigns) (collectively, the "Lender Released Parties") from certain liability for actions taken or omitted in connection with the Plan and its Confirmation.  In addition, the Plan provides for a exculpation or release by the Debtor, the Debtor's equity holder(s) and anyone purporting to act on their behalf of any claim, whether equitable or legal, disputed, contingent or unliquidated against the Lender Released Parties in connection with the Debtor, the Note, or any action taken in connection therewith.

### 3.   Injunction

The Plan provides for an injunction upon the Effective Date, subject to the terms of the Settlement, against all persons who have held, hold, or may hold Claims or Interests, from taking certain actions against or affecting the Debtor or assets of the Debtor with respect to such Claims,

Interests, except as otherwise set forth in the Plan.

### 4. <u>Retention of Jurisdiction</u>

The Plan provides for the retention of jurisdiction by the Bankruptcy Court for certain enumerated matters including but not limited to, matters which may be necessary to carry out the Plan or resolve disputes relating to the Plan, resolution and litigation (if necessary) on Disputed Claims and to recover assets.

### 5. <u>Contracts and Unexpired Leases</u>

The Plan provides for the mechanism for the assumption or rejection of unexpired leases and executory contracts. It provides that any executory contract or unexpired lease which is not expressly assumed or rejected prior to Confirmation shall be deemed rejected as of the Petition Date. Any counterparty to an executory contract or unexpired lease shall have thirty (30) days from the Confirmation Date to file a rejection damage Claim. In the event that such counter-party to the contract or lease does not timely file a proof of Claim it shall be barred from doing so after the expiration of the deadline. In the event of a disagreement about any Claim asserted, an appropriate written objection shall be filed with the Court within sixty (60) days after the Closing Date.

### 6. <u>Discharge and Injunction</u>

The Plan provides that in the event that the Debtor is successful in closing on the Exit Financing, subject to its obligations under the Plan and the Settlement, it shall receive a discharge of liability for payment of debts incurred by the Debtor prior to Confirmation. On the other hand, if an Alternative Sale Process is triggered, the Plan is no longer a reorganization but would be deemed a liquidation and as such, the Debtor is not entitled to a discharge. However, the sale of the Property would be free and clear of all liens, Claims and encumbrances and the confirmation injunction would remain in effect. Therefore, both the Property and the purchaser at auction would be protected from the pre-Petition Date Claims of the Debtor and the Debtor would not suffer interference in the effectuation of the Plan from any such creditors as a result of the protections of the confirmation injunction.

### IV.  <u>PLAN CONFIRMATION REQUIREMENTS AND PROCEDURES</u>

To be confirmable, the Plan must meet the requirements listed in section 1129 of the Bankruptcy Code. The requirements include, but are not limited to, the proposal of the Plan in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor at least as much as the creditor would receive in a chapter 7 liquidation case, unless the creditor votes to accept the Plan; and the Plan must be feasible.

### A.    Who May Vote or Object

Any party in interest may object to the Confirmation of the Plan if the party believes that the requirements for Confirmation are not met. Certain parties in interest, however, are not entitled to vote to accept or reject the Plan. A Creditor has a right to vote for or against the Plan only if that Creditor has a Claim that is both (1) Allowed or Allowed for voting purposes and (2) Impaired. In this case, the Debtor believes that Classes 2, 3 and 4 are Impaired under the Plan and that Holders of Claims in those Classes are entitled to vote to accept or reject the Plan.

### 1.    What is an Allowed Claim?

Only a creditor with an Allowed Claim has the right to vote on the Plan. Generally, a Claim is Allowed if either (a) the Debtor has scheduled the Claim on the Debtor's Schedules, unless the Claim has been scheduled as disputed, contingent or unliquidated, or (b) the Creditor has filed a proof of Claim, unless an objection has been filed to such proof of Claim. When a claim is not Allowed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and hearing, either overrules the objection or Allows the Claim for voting purposes pursuant to Bankruptcy Rule 3018(a).

### 2.    What is an Impaired Claim?

As noted above, the Holder of an Allowed Claim has the right to vote only if it is in a Class that is Impaired under the Plan. As provided in § 1124 of the Bankruptcy Code, a Class is considered Impaired if the Plan alters the legal, equitable or contractual rights of the members of that Class.

### 3.    Who is Not Entitled to Vote?

The Holders of the following five types of Claims are not entitled to vote:

- Holders of Claims that have been disallowed by an order of the Bankruptcy Court or as to which there is a claims objection motion pending;
- Holders of other Claims that are not Allowed Claims (as discussed above), unless they have been Allowed for voting purposes;
- Holders of Claims in unimpaired Classes;
- Holders of Claims entitled to priority pursuant to § 507(a)(2), (a)(3), and (a)(8) of the Bankruptcy Code;
- Holders of Claims in Classes that do not receive or retain any value under the Plan; and
- Administrative expenses.

### 4.    Who Can Vote In More Than One Class?

A Creditor whose Claim has been Allowed in part as a Secured Claim and in part as an Unsecured Claim, or who otherwise holds Claims in multiple classes, is entitled to accept or reject a plan in each capacity and should cast one ballot for each Claim.

### B.      Votes Necessary to Confirm the Plan

If Impaired Classes exist, the Bankruptcy Court cannot confirm the Plan unless (i) at least one Impaired Class of Creditors has accepted the Plan without counting the votes of any Insiders within that Class, and (ii) all impaired Classes have voted to accept the Plan.

A Class of Claims accepts the Plan if both of the following occur: (a) the Holders of more than one-half (1/2) of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan, and (b) the Holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims in the Class, who vote, cast their votes to accept the Plan. **The Holders of Claims in Classes 2, 3, 4 and 5 are Impaired and entitled to vote to accept or reject the Plan, and the votes of such Holders will be solicited. Class 1 is not Impaired under this Plan and are, therefore, conclusively presumed to have accepted this Plan.**

### C.      Fair and Equitable Test; Cramdown

Notwithstanding a rejection by a Class of Impaired Claims, the Bankruptcy Court may Confirm the Plan and the Plan will be binding upon all Classes, including the Class rejecting the Plan, if it is demonstrated to the Bankruptcy Court that at least one Impaired Class of Claims has accepted the Plan and the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting Class.  A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other Classes whose legal rights are similar to those of the dissenting class and if no Class receives more than it is entitled to on account of its Claims or Interests.

Under the Bankruptcy Code, the Debtor's Plan is "fair and equitable" as to a non-accepting impaired Class of Unsecured Claims if it provides that each Holder of a Claim in such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim, or the Holder of any Claim or Interest that is junior to the Claims of such Class will not receive or retain under the Plan on account of such junior Claim or Interest any property.

### D.      Feasibility

The Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, unless such liquidation or reorganization is proposed in the Plan.

The amount necessary to consummate the Plan, assuming that the Debtor is able to successfully close a Funding Transaction, is approximately $76,696,749, computed as follows:

| | |
|---|---|
| Non-Professional Administrative Claims – (est.) | $0 |
| Administrative Claims - Professional Fees (estimated) | $75,000.00 |
| Administrative Claims – UST Fees | $13,500 |
| Priority Tax Claims (estimated) | $0 |
| Class 1 – Allowed Secured Real Estate Taxes (est.) | $1,165,374 |
| Class 2 – Allowed Secured Claim of Signature | $75,000,000 |
| Class 3 – Allowed Undersecured Claims of Lienholders Against the Property | $137,440.00[3] |
| Class 4 – General Unsecured Creditor | $305,433.00[3] |

The amount necessary to consummate the Plan, assuming that the Debtor is unable to successfully close a Funding Transaction and an Alternate Sale Process is triggered wherein the Lender is the successful bidder, is approximately $1,502,374, computed as follows:

| | |
|---|---|
| Non-Professional Administrative Claims – (est.) | $0 |
| Administrative Claims - Professional Fees (estimated) | $75,000 |
| Administrative Claims – UST Fees | $12,000 |
| Priority Tax Claims (estimated) | $0 |
| Class 1 – Allowed Secured Real Estate Taxes (est.) | $1,165,374 |
| Class 3 – Allowed Undersecured Claims of Lienholders Against the Property | $250,000 |
| Class 4 – General Unsecured Creditor | |

If the Lender is not the successful bidder, the amount payable to Classes 3 and 4 would be an amount greater than each holder's pro rata share of $250,000. It is impossible for the Debtor to project what that amount would be so the minimum amount is presumed for purposes of this Disclosure Statement.

**You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.**

### A.      Who May Object

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met.

---

3 Assumes that all holders of Allowed Claims elect Option 1 for treatment, lump sum payment of original principal obligation. If, on the other hand, such holders elect Option 2, the amount necessary to consummate the Plan would be less.

**B. Confirmation**

    **1.**    **Confirmation hearing**

       Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of a plan. Notice of the confirmation hearing of the Plan has been provided to all known holders of Claims and Interests or their representatives along with this Disclosure Statement. The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent confirmation hearing. At the confirmation hearing, the Bankruptcy Court will (i) hear and determine all objections to the Plan and to confirmation of the Plan; (ii) determine whether the Plan meets the requirements of the Bankruptcy Code and has been proposed in good faith; and (iii) confirm or refuse to confirm the Plan.

       Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtor's estate or property, and the basis for the objection and the specific grounds in support thereof. Such objection must be filed with the Bankruptcy Court together with proof of service thereof, and served upon:

To the Debtor:

Kirby Aisner & Curley LLP
700 Post Road, Suite 237
Scarsdale, New York 10583
Attn: Erica R. Aisner, Esq.
eaisner@kacllp.com

with a copy to Lender's counsel:

Kriss & Feuerstein LLP
360 Lexington Avenue, Suite 1200
New York, NY 10017
Attn: Jerold C. Feuerstein, Esq.
jfeuerstein@kandfllp.com

and the Office of the United States Trustee:

Office of the United States Trustee
201 Varick Street, Suite 1006
New York, New York 10014
Attn: Greg Zipes, Esq.

greg.zipes@usdoj.gov

so as to be received no later than the date and time designated in the notice of the Confirmation hearing.

**2.**    **Statutory Requirements for Confirmation of the Plan**

At the confirmation hearing, the Debtor will request that the Bankruptcy Court determine that the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. If so, the Bankruptcy Court shall enter an order confirming the Plan. The applicable requirements of section 1129 of the Bankruptcy Code are as follows:

(a)    The Plan must comply with the applicable provisions of the Bankruptcy Code;

(b)    The Debtor must have complied with the applicable provisions of the Bankruptcy Code;

(c)    The Plan has been proposed in good faith and not by any means forbidden by law;

(d)    Any payment made or promised to be made by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the Chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e)    The Debtor has disclosed the identity and affiliation of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor under the Plan. Moreover, the appointment to, or continuance in, such office of such individual, is consistent with the interests of holders of Claims and Interests and with public policy, and the Debtor has disclosed the identity of any insider that the Reorganized Debtor will employ or retain, and the nature of any compensation for such insider.

(f)    Feasibility and "Best Interest" Tests:

The Bankruptcy Code requires that in order to confirm the Plan the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtor (the "Feasibility Test"). For a Plan to meet the Feasibility Test, the Bankruptcy Court must find that the Debtor will possess the resources to meet its obligations under the Plan. The Plan satisfies the Feasibility Test because it includes a failsafe measure in that if the Debtor is unable to close a Funding Transaction, there is a mechanism by

24

which the Property will be liquidated and the assets distributed in accordance with the priority scheme of the Bankruptcy Code.

Moreover, the Debtor has offered holders of Allowed Class 3 and Class 4 Claims an alternative treatment which includes a larger distribution but over a much longer period of time. While there is always risk in payment that is contingent on development, business operations and the passage of time, this is merely an option if creditors elect to remain "in the deal" for the longer term in exchange for the potential for a larger recovery.

The Bankruptcy Court must also determine that the values of the distributions to be made under the Plan to each Class will equal or exceed the values which would be allocated to such Class in a liquidation under Chapter 7 of the Bankruptcy Code, absent their consent to different treatment (the "Best Interest Test"). To determine if the Plan is in the best interest of each Class, the probable results of Chapter 7 liquidation must be compared with the results proposed under the Plan. The comparison of these results is discussed below and are illustrated in the analysis annexed hereto as Exhibit "A."

The Best Interest Test is satisfied in this case because (i) Lender has consented to the Discounted Payoff which is significantly less than the Allowed Class 2 Claim which it would be entitled to claim in a liquidation, and (2) the remaining creditors are receiving more than they would in a liquidation.

In a Chapter 7,

i.    Lender would be entitled to recover the full amount of its Allowed Class 2 Claim which is in excess of $102,300,748.25 as of the Petition and growing daily. Any sale of the Property in a Chapter 7 would certainly occur later than the anticipated Closing Date under the Plan so the interest due Lender, which accrues at approximately $25,029.73 per day, would continue to grow, as would Lender's legal fees and the Class 1 Allowed Claim (real estate taxes). In 2021 the Debtor obtained an appraisal which valued the Property at approximately $152 million dollars, which valuation does not take into consideration the political and community opposition, largely stemming from the influence of Aaron Sosnick, and regulatory and legal hurdles. As such, in a Chapter 7, the Debtor submits that the value which could be realized by a sale of the Property would be less than the Chapter 11 Administrative Claims, Allowed Class 1 and Class 2 Secured Claims, with no recovery to subordinate classes of creditors.

ii.   Even under an Alternate Sale Process, the Property will either be sold to Lender (pursuant to a credit bid) whereby Lender will fund, (i) the Allowed Secured Class 1 Claim, (ii) all Allowed Priority and Administrative Expenses including any outstanding U.S. Trustee fees;

and (iii) the Class 3 and 4 Initial Class Distribution of $250,000. This funding from Lender would not exist in a Chapter 7.

iii.    The recovery would further be reduced by the additional administrative costs of a Chapter 7 and the trustee's professionals which would be paid prior to any unsecured creditors receiving a distribution.

As set forth above, the Debtor submits that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, including the "best interest" and feasibility requirements. The Plan is "fair and equitable" and "does not discriminate unfairly." The Plan complies with all other requirements of Chapter 11 of the Bankruptcy Code and the Plan has been proposed in good faith.

### E.    Financial Information

(a)    <u>Debtor's Schedules of Assets and Liabilities</u>. Schedules of the Debtor's assets and liabilities have been respectively filed with the Clerk of the Court and may be inspected by all interested parties.

(b)    <u>Post-Petition Liabilities</u>. All Post-Petition Liabilities will be paid in full under the Plan, subject to the filing of timely Claims and the Allowance thereof by the Court.

(c)    <u>Liquidation Analysis</u>. As set forth above, were the estate liquidated under Chapter 7 of the Bankruptcy Code as opposed to the means set forth herein, holders of Claims would certainly receive less.

## V. <u>POST-CONFIRMATION MATTERS</u>

### A.    Disbursement of Funds and Delivery of Distribution

The Disbursing Agent shall be Kirby Aisner & Curley LLP (the "<u>Disbursing</u> <u>Agent</u>") with respect to all distributions to be made on or in connection with the Closing Date. Provided that an Alternative Sale Transaction is not triggered, with respect to any distributions to be made to holders of Allowed Class 3 and Class 4 Claims pursuant to their election for distributions under *Option 2,* such distributions shall be made by the Debtor.

The Disbursing Agent shall not be liable for any distributions obligated under or made in accordance with this Plan. The Disbursing Agent shall not be liable to the Debtor, any creditor or any other person, firm or corporation, for any error of judgment or for any mistake of law or fact or any act done caused to be done, or omitted to be done, by the Disbursing Agent or any or its agents. The Disbursing Agent shall be liable only for acts of willful misconduct, gross negligence or breach of fiduciary duty by itself or such agents.

With respect to services to be rendered by the Disbursing Agent, the Debtor's estate shall pay the reasonable compensation and out-of-pocket expenses incurred by the Disbursing Agent after twenty (20) days presentation of a written invoice to the Debtor and in the absence of an objection. In the event of a dispute with respect thereto, such dispute shall be subject to determination by the Bankruptcy Court.

## B.   Unclaimed Cash

In the event any holder of a Claim fails to claim any distribution within ninety (90) days from the date of such distribution, such holder shall forfeit all rights thereto, and to any and all future payments, and thereafter the Claim for which such cash was distributed shall be treated as a disallowed Claim.

Distributions to holders of a Claim entitled thereto shall be sent to their last known address set forth on a proof of claim filed with the Bankruptcy Court or if no proof of claim is filed, on the Schedules filed by the Debtor, as may have been amended from time to time, or to such other address as may be designated by a Creditor, such notification having been received at least two (2) weeks prior to a distribution so as to allow the Debtor adequate time to update its records. Nothing contained in the Plan or this Disclosure Statement will require the Debtor to attempt to locate any holder of an Allowed Claim.

## C.   Post-Effective Date Management of the Reorganized Debtor.

Post-Effective Date, Gregg Singer, the President of Manager of the Debtor, shall remain in management and control of the Debtor, its Property (provided there is no sale pursuant to an Alternate Sale Process) and the Action, in accordance with the Debtor's Operating Agreement.

## D.   Avoidance and Recovery Actions

The Debtor does not believe that the estate possesses any avoidance claims that could be pursued for the benefit of creditors.

# VI. TAX CONSEQUENCES OF CONFIRMATION

Confirmation may have federal income tax consequences for the Debtor and holders of Claims and Interests. The Debtor has not obtained and does not intend to request a ruling from the Internal Revenue Service (the "IRS"), nor has the Debtor obtained an opinion of counsel with respect to any tax matters.  Any federal income tax matters raised by confirmation of the Plan are governed by the Internal Revenue Code and the regulations promulgated thereunder.  Creditors and holders of Interests are urged to consult their own counsel and tax advisors as to the consequences to them, under federal and applicable state, local and foreign tax laws, of the Plan. The following is intended to be a summary only and not a substitute for careful tax planning with a tax professional.  The federal, state and local tax consequences of the Plan may be complex in

some circumstances and, in some cases, uncertain. Accordingly, each holder of a Claim or Interest is strongly urged to consult with his or her own tax advisor regarding the federal, state and local tax consequences of the Plan, including but not limited to the receipt of cash and/or stock under this Plan.

### A. Tax Consequences to the Debtor.

The Debtor may not recognize income as a result of the discharge of debt pursuant to the Plan because section 108 of the Internal Revenue Code provides that taxpayers in bankruptcy proceedings do not recognize income from discharge of indebtedness. However, a taxpayer is required to reduce its "tax attributes" by the amount of the debt discharged. Tax attributes are reduced in the following order: (i) net operating losses; (ii) general business credits; (iii) capital loss carryovers; (iv) basis in assets; (v) passive activity loss and credit carryovers; and (vi) foreign tax credit carryovers.

### B. Tax Consequences to Unsecured Creditors.

An unsecured creditor that receives cash in satisfaction of its Claim may recognize gain or loss, with respect to the principal amount of its Claim, equal to the difference between (i) the creditor's basis in the Claim (other than the portion of the Claim, if any, attributable to accrued interest), and (ii) the balance of the cash received after any allocation to accrued interest. The character of the gain or loss as capital gain or loss, or ordinary income or loss, will generally be determined by whether the Claim is a capital asset in the creditor's hands. A creditor may also recognize income or loss in respect of consideration received for accrued interest on the Claim. The income or loss will generally be ordinary, regardless of whether the creditor's Claim is a capital asset in its hands.

## VII. ALTERNATIVES TO THE PLAN AND CONSEQUENCES OF NOT CONFIRMING

Among the possible consequences if the Bankruptcy Court should not confirm the Plan are the following: (1) an alternative plan could be proposed or confirmed; or (2) the Chapter 11 case could be converted to liquidation under Chapter 7 of the Bankruptcy Code.

### A. Alternative Plans

The Debtor believes that the Plan is the best opportunity to recover for Creditors on their Allowed Claims and Interests. Given that the Lender supports the proposed Plan, it is extremely unlikely that any alternate chapter 11 plan could possibly propose treatment which is better than the Debtor's Plan given that it would not include the failsafe mechanisms agreed to by the Debtor and Lender. Moreover, any alternate plan, which has yet to be proposed would certainly carry with it delay, cost and risk, none of which would be in the interests of the Creditors or the estate.

### B. Chapter 7 Liquidation

As discussed at length above in connection with the Best Interest Test, the Debtor believes that if this Chapter 11 case was converted to Chapter 7 liquidation, holders of Claims would receive a significantly decreased distribution, if any distribution at all, and would suffer delay in receipt thereof.

## VII.    RECOMMENDATION AND CONCLUSION

The Debtor and its professional advisors have analyzed different scenarios and believe that the Plan is preferable to a conversion to a case under Chapter 7 of the Bankruptcy Code. The Plan will provide greater recoveries than those available in liquidation to all holders of Claims.  Any other alternative would cause significant delay and uncertainty, as well as substantial administrative costs.

ACCORDINGLY, THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERY POSSIBLE FOR CLAIMHOLDERS.

Dated:  New York, New York
        July 14, 2023

9th & 10th STREET, L.L.C.


By:    _/s/ Gregg Singer_____
        Gregg Singer, on behalf of Manager

KIRBY AISNER & CURLEY LLP
*Attorneys for the Debtor*
700 Post Road, Suite 237
Scarsdale, New York 10583
(914) 401-9500


By:_/s/ Erica R. Aisner_____
        Erica R. Aisner, Esq.

30